**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

PATRICIA GREER,

                 Plaintiff,

      v.

JOHN "NICK" NICEWONDER,

                 Defendant.

**Index No. 21-cv-4631**

**VERIFIED COMPLAINT**

**Jury Trial Demanded**

Through undersigned counsel, Plaintiff Patricia Greer brings the following action against Defendant John "Nick" Nicewonder:

1. In 2018, Mr. Nicewonder wanted to break into the music industry.

2. Knowing that Ms. Greer had significantly more experience, connections, and expertise in the industry, Mr. Nicewonder asked her to start a music business—any music business—with him.

3. Ms. Greer agreed to partner with him and non-party Tess Plummer in founding and running the music venue now known as Purgatory.

4. Without any warning to Ms. Greer, Defendant Nicewonder and Ms. Plummer brought non-party Emilie Galambos (together, the "**Members**") on board.

5. To further Mr. Nicewonder's goals, Ms. Greer incorporated Nicewonder & Associates LLC (the "**LLC**") and negotiated a highly favorable lease in a busy nightlife district of Bushwick, Brooklyn.

6.      The Members agreed that Mr. Nicewonder would own 51% of the LLC, since his family money provided the LLC's start-up capital.

7.      Meanwhile, the three women would each own 16.33% of the LLC.

8.      For the next two years, Ms. Greer worked tirelessly to transform the Members' dream into reality.

9.      Ms. Greer and her colleagues' work manifested in Purgatory, a bar, music venue, and recording studio in Bushwick, Brooklyn ("**Purgatory**" or the "**Venue**").

10.     To open and run Purgatory, Ms. Greer not only identified and executed nearly all white-collar tasks—from incorporating the LLC to identifying physical spaces, negotiating the Venue's lease, and obtaining the Venue's liquor license—but also helped build out the space; recruited and booked performers; developed the Venue's food and drinks menu; and hired, trained, and supervised the Venue's staff.

11.     The Venue received its liquor license the very same week that New York declared a state of emergency and shut all bars and music venues.

12.     But Ms. Greer's ingenuity and grit ensured its survival.

13.     In spring and summer 2020, Ms. Greer—who remained in New York City while the other three Members, including Mr. Nicewonder, all retreated out of state—reworked the Venue to open it for outdoor and socially-distanced drinking and dining.

14.     Ms. Greer's labor and expertise were crucial to the fledgling Venue's survival.

15.     In fact, the Venue's revenue covered all operating costs within two months of reopening in summer 2020.

16.     This was a remarkable feat for any bar or concert hall, let alone a brand-new space that received its liquor license the very same week that Covid-19 closed New York nightlife and was operating on the sidewalk instead of its 100+ person leased indoor premises.

17.     But when Mr. Nicewonder finally returned to New York, he forced Ms. Greer out of the LLC and the Venue and terminated her employment.

18.     To justify his naked attempt to hoard Ms. Greer's work for himself, Mr. Nicewonder told Ms. Greer and the Venue's employees that the he and the other Members fired Ms. Greer because she had broken the law.

19.     The Members knew, however, that Ms. Greer had done no such thing.

20.     In fact, Mr. Nicewonder, Ms. Plummer, and Ms. Galambos had known and ratified Ms. Greer's supposedly "illegal" acts: filing for unemployment benefits and purchasing construction materials.

21.     Instead of professionally resolving any personality or other disputes he had with Ms. Greer, Mr. Nicewonder chose to lie about her performance to both Ms. Greer and the tight-knit Brooklyn hospitality and music industries.

22.     When he forced her out, Mr. Nicewonder offered to pay Ms. Greer $4,500 for her equity in the LLC (the "**Offer**").

23.     Mr. Nicewonder appears to have pulled the Offer out of thin air.

24.     Yet even after Ms. Greer retained counsel, and despite the detailed requirements of the LLC's Operating Agreement, Mr. Nicewonder and the other

3

Members refused to explain the basis for their Offer or provide any financials or other documents that would help Ms. Greer evaluate the Offer.

25.     Moreover, despite the Operating Agreement's mandate that Ms. Greer receive "compensation equal to the value of services" provided, neither Mr. Nicewonder nor any of the other Members has ever offered to pay or actually paid her a cent for her labor.

26.     To this day, Mr. Nicewonder continues to reap the benefits of Ms. Greer's work while refusing to allow her to participate in the LLC or Venue, buy out her equity in the LLC, or pay her for her services.

27.     To further his scheme to deprive Ms. Greer of her equity stake and wages, Mr. Nicewonder also merged out the LLC and rendered it inactive, stripping it of its assets and moving them to a new entity, Purgatory Events LLC.

28.     Accordingly, Ms. Greer files this lawsuit.

## The Parties, Jurisdiction, and Venue

29.     Plaintiff Patricia Greer is a natural person who is a citizen of New York and lives in New York County.

30.     Defendant John "Nick" Nicewonder is a natural person who, upon information and belief, is a citizen of North Carolina.

31.     Pursuant to 28 U.S.C. § 1391, venue is proper in this district because a substantial part of the events or omissions giving rise to Ms. Greer's claims occurred in this district.

32.     The Court has personal jurisdiction over Mr. Nicewonder because he transacts business within New York and has committed tortious acts in New York and caused injury to Ms. Greer when she was in New York.

33.     The nexus of Mr. Nicewonder's wrongful activity is New York, because his wrongful acts and omissions all occurred in or are related to the LLC, which was incorporated in New York; the Venue, which is located in Kings County, New York; and Ms. Greer, who lives in New York County and works in Kings County, New York.

34.     Pursuant to 28 U.S.C. § 1332, this Court may exercise diversity jurisdiction in this action because Ms. Greer and Mr. Nicewonder are citizens of different states and the damages at issue exceed $75,000.

**Ms. Greer is a Trusted Expert in Nightlife, Hospitality, and Independent Music**

35.     Ms. Greer met Ms. Plummer in 2015 in Nashville, Tennessee.

36.     In Nashville, Ms. Greer immersed herself in the music industry, not only majoring in Public Relations and Marketing and Music Business, but also running a music and arts venue, managing multiple music artists, and interning for concert production companies, music marketers, and record labels.

37.     Ms. Greer moved to New York City to further her music business career, initially working in label operations and artist rights management.

38.     Ms. Greer also was active in New York City's nightlife and music scenes: in addition to her day jobs, she booked events, managed musicians, and bartended part-time.

39.     By the time she began working with Mr. Nicewonder, Ms. Greer had built a reputation as a trusted expert in New York's and Nashville's indie and DIY music and arts communities.

**To Break Into the Music Business, Mr. Nicewonder Needed Ms. Greer**

40.     Mr. Nicewonder, Ms. Plummer, and Ms. Galambos had significantly less experience in the music business than Ms. Greer did.

41.     All three attended the same private university in Nashville.

42.     Mr. Nicewonder studied Audio Engineering and History, while Ms. Galambos and Ms. Plummer majored in Music Business Administration.

43.     Ms. Greer, meanwhile, graduated from Middle Tennessee State University.

44.     In November 2018, Mr. Nicewonder and Ms. Plummer approached Ms. Greer because they wanted her to help them start a record label.

45.     At the time, Ms. Plummer worked as a college radio promoter and Mr. Nicewonder worked as a barista.

46.     Mr. Nicewonder reached out to Ms. Greer because his family had given him a large sum of money and his father wanted him to start his own business.

47.      Ms. Greer explained that because her background and experience were more focused on live events and hospitality, she thought she would be a better fit for helping them open a brick-and-mortar music venue than a brand-new record label.

48.     Ms. Greer suggested, however, that if Mr. Nicewonder had his heart set on starting his own record label, the venue could record performances and release the recordings that the venue mixed and mastered in-house.

49.     Mr. Nicewonder and Ms. Plummer agreed with Ms. Greer and the three began working together.

50.     In November and December 2018, Ms. Greer, Mr. Nicewonder, and Ms. Plummer fleshed out additional details of their future business.

51.     The three generally agreed that all of them would equally split the workload of the new business, with Ms. Greer taking the lead on operations, including all steps and paperwork necessary to launch and run the venue.

52.     Mr. Nicewonder would fund the business with at least $70,000 of his family's money.

53.     (Indeed, the LLC shares its service address with other family entities, including Central Coal Company, Nicewonder Group, LLC, Eaglehawk Carbon, Inc., and Little Six Corp. d/b/a Short Mountain Silica.)

54.     Ms. Plummer and Mr. Nicewonder would work under Ms. Greer's direction.

55.     Mr. Nicewonder explained that because he was providing the start-up capital, his father insisted that he would have a majority stake in the future corporation.

56.     However, all Members would be paid for their time, in addition to amassing equity.

57.     Ms. Greer and Ms. Plummer agreed to this division in principle.

58.     To formalize their understanding, Ms. Greer, Mr. Nicewonder, and Ms. Plummer executed the LLC's Operating Agreement on or around January 28, 2019 (the "**Operating Agreement**").

59.     A true and correct, but unsigned, copy of the Operating Agreement is annexed hereto as Exhibit A.

60.     The Parties kept the executed Operating Agreement and other key documents in a filing cabinet at the Venue.

**Throughout 2019, Ms. Greer Worked to Make the Venue a Reality**

61.     Once the three signed the Operating Agreement, Ms. Greer handled the majority of the start-up work.

62.     Among other tasks, Ms. Greer incorporated the LLC; researched spaces and met with real estate brokers; and negotiated the Venue's eventual ten-year lease.

63.     The Members executed the Venue's lease in April 2019.

64.     Ms. Greer handled all of the lease negotiations, including securing four months of rent concessions before the Members signed the lease.

65.     During that time period, Mr. Nicewonder and Ms. Plummer did no work for the LLC or Venue except occasionally accompanying Ms. Greer to visit potential spaces for the Venue.

66.     The three Members also opened an LLC bank account (the "**Bank Account**").

67.     The Bank Account is still open.

8

68.     Shortly before the Members signed the Venue's lease, Mr. Nicewonder and Ms. Plummer told Ms. Greer that they were going to add Ms. Galambos as a member of the LLC.

69.     To memorialize the now four-member partnership, the Parties executed an April 18, 2019 Memorandum of Understanding ("**MOU**") providing, among other terms, that Mr. Nicewonder would own 51% and Mses. Greer, Plummer, and Galambos each would own 16.33% of the LLC.

70.     The MOU also stated that "it will be replaced with a signed Operating Agreement by the Parties within the first year of business operation."

71.     The Members never "replaced" the MOU or otherwise negotiated or executed a new operating agreement.

72.     A true and correct copy of the MOU is annexed hereto as Exhibit B.

73.     Once the LLC secured the lease, Ms. Greer tapped her own network and enlisted the help of veteran Bushwick bar owners as consultants on the Venue's construction, as well as on payroll and other back-office functions.

74.     In summer 2019, Ms. Greer put in the work to ensure that the Venue could serve alcohol and host performances, applying for the Venue's liquor license and attending multiple community board meetings as the LLC's and Venue's representative.

75.     Ms. Greer also pursued other leads for the LLC, such as meeting with coffee distributors and modeling the financial risks and rewards of running the Venue as a coffee shop during the day.

76.     Mr. Nicewonder and Ms. Galambos acquired used furniture from a country club owned by Mr. Nicewonder's family, and Ms. Galambos arranged for insurance.

77.     Ms. Greer, meanwhile, handled the Venue's design and details with the Venue's consultants, from hand-painting fixtures to attending auctions for barware.

78.     By November 2019, the Venue was ready to open.

79.     Just one step remained: the state still had not approved the Venue's liquor license application, which Ms. Greer had submitted in July 2019.

80.     The Parties pressed ahead anyway, opening the Venue as a private event space from November 2019 through the March 2020 Covid-19 State of Emergency declaration.

81.     During that time, Ms. Greer tapped her own relationships to arrange nearly all of the Venue's income streams, booking ten of the Venue's 12 events and arranging multiple music video and short film shoots, among other events.

82.     Ms. Greer also taught the other Members how to book events and created operations procedures and manuals so that they and the Venue's future employees could book, organize, set up, and break down events themselves.

83.     Moreover, Ms. Greer developed relationships and contracts with the beer and liquor vendors that eventually would supply the Venue.

**Ms. Greer Ensured that the Venue Survived and Thrived Through Covid-19**

84.     In March 2020, the Venue finally received the liquor license that Ms. Greer had applied for nearly nine months earlier.

85.     But that same week, New York City declared a state of emergency, shutting down all bars, restaurants, and music and other nightlife venues to stop the spread of Covid-19.

86.      At the time, Mr. Nicewonder was out of town on a ski trip.

87.     He remained out of state until fall 2020, when he briefly returned and forced out Ms. Greer before returning to his homes in Virginia and North Carolina.

88.     Ms. Plummer also left New York City and did not return until late summer 2020.

89.     Ms. Galambos nominally maintained a New York City residence, but took multiple long trips out of town.

90.     Ms. Greer, meanwhile, stayed in the city and found a path forward for the fledgling venue.

91.     In spring 2020, Ms. Greer arranged for the Venue to begin hosting virtual performances online.

92.     In May and June 2020, Ms. Greer applied and received city approval for the Venue to open for outdoor dining.

93.     Ms. Greer recruited, hired, trained, and managed a staff, including a bar manager.

94.     After seeking counsel from the city's Department of Small Business Services, Ms. Greer repurposed and rebuilt the Venue's yard so that the Venue could expand its capacity to not just the sidewalk, but also the previously-undeveloped yard.

95.     Moreover, Ms. Greer handled all details necessary to provide outdoor dining services, such as budgeting for and sourcing disposable containers—not traditionally necessary for a music venue or bar—and changing the Venue's drinks and food menu to accommodate thew new normal.

96.     Throughout the shutdown, Ms. Greer negotiated numerous concessions with the Venue's landlord, including forgiving three months' rent.

97.     Ms. Greer also negotiated a 33% rent reduction from July through at least October 2020.

98.     Ms. Greer does not know whether the LLC continued to receive this rent discount after Mr. Nicewonder forced her out of the business.

99.     Ms. Greer also worked to remodel the Venue by refinishing its floors and hand-painting the stairwell, bar, entry, and ceilings.

100.    Once the Venue re-opened, Ms. Greer and Ms. Plummer worked there nearly every day, both as bartenders and as managers.

101.    The Venue succeeded.

102.    In September and October 2020, with a staff of eight people besides the Members, the LLC earned enough to cover its operating costs.

103.     This was an impressive feat for a brand-new bar under any circumstances, let alone for one that opened during the state of emergency and could not operate anywhere near its full capacity.

### Instead of Professionally Parting Ways with Ms. Greer, Mr. Nicewonder Fabricated Excuses to Freeze Her Out

104.     In October 2020—shortly after Mr. Nicewonder returned to New York City—he and the other Members summoned Ms. Greer to a meeting.

105.     At that meeting, the other Members told Ms. Greer that they were freezing her out of the LLC and firing her from the Venue.

106.     Mr. Nicewonder claimed that they were doing so because Ms. Greer had gone behind their backs to apply for unemployment benefits and make unauthorized purchases in spring 2020.

107.     Both of those reasons were lies.

108.     Ms. Greer and the other Members discussed applying for unemployment benefits and making those purchases before Ms. Greer did either.

109.     In fact, Ms. Greer was not the only LLC member who applied for unemployment benefits.

110.     Furthermore, the allegedly-wrongful purchases were permissible and nominal business expenses that had been pre-approved by the other Members.

111.     The fact of the matter is, Mr. Nicewonder just did not want to work with Ms. Greer anymore.

112.    But instead of resolving their differences or professionally separating, Mr. Nicewonder retained outside counsel to fabricate bogus "reasons" to kick Ms. Greer out of the LLC and Venue.

113.    In doing so, Mr. Nicewonder appears to have provided his counsel with false information and withheld key contracts and communications.

114.    Despite retaining counsel, Mr. Nicewonder also failed to follow any of the relevant procedures established in the Operating Agreement.

115.    Those procedures were both standard and commercially reasonable.

**In Forcing Ms. Greer Out of the LLC, Mr. Nicewonder Broke the Law and Breached the Operating Agreement**

116.    The Operating Agreement provides that all Members, including Ms. Greer, are "entitled to compensation equal to the value of the services" they provide to the LLC.

117.    However, Mr. Nicewonder has refused to compensate Ms. Greer for any of the labor and services she provided over the years.

118.    Although Mr. Nicewonder initially stated he would negotiate his original $4,500 Offer, he never engaged with Ms. Greer's counter-offers, which she communicated throughout fall 2020 and winter and spring 2021.

119.    Mr. Nicewonder also refused Ms. Greer's demands for the LLC's books and records so she could obtain an independent appraisal of her stake in the LLC.

120.     The necessary records include not just profit-and-loss statements, but also inventory logs, labor and wage records, and detailed expense records, among other documents.

121.     Eventually, Mr. Nicewonder, through counsel, provided Ms. Greer with a one-page spreadsheet to justify the Offer.

122.     That spreadsheet, annexed as Exhibit C, bears no indicia of reliability: no substantiation, no analysis, no explanation.

123.     The spreadsheet does not even identify the accountants who supposedly created it.

124.     Despite Ms. Greer's repeated requests, neither Mr. Nicewonder nor the other Members has ever explained who provided this supposed valuation or what materials that person relied upon in creating the document.

125.     Moreover, Mr. Nicewonder's freeze-out of Ms. Greer breached the Operating Agreement's dispute resolution and separation processes.

126.     Section 4.4 provides that the other Members only could have forcibly bought out Ms. Greer's equity if (a) she "fail[ed]" at "her duties for a period of 120 consecutive days," (b) the other Members "documented" that "start date of the failure," (c) the other Members provided Ms. Greer with notice of and a cure period to address that supposed failure, and (d) the other Members honored Ms. Greer's "complete powers of membership" throughout the dispute period.

127.     Mr. Nicewonder and the other Members did not take a single one of these steps, let alone fulfill Section 4.4's other requirements.

128.    Had they done so, or even just communicated with Ms. Greer in a remotely professional manner, we would not be here today.

129.    As far as Ms. Greer knows, she still nominally is a member of the LLC—albeit one with no power whatsoever.

130.    Moreover, the other Members continue to take advantage of Ms. Greer's membership status while stripping her of her "complete powers of membership."

131.    For example, Ms. Greer signed the Venue's lease, the LLC's bank accounts, and the Venue's liquor license.

132.    Finally, in freezing out Ms. Greer, Mr. Nicewonder and the other Members also lied to the Venue's staff about Ms. Greer, telling them that they fired Ms. Greer because she broke the law.

133.    At the time Mr. Nicewonder made these statements, he knew or should have known they were false.

134.    Indeed, the other Members engaged in the very same supposedly-wrongful conduct that Ms. Greer did.

135.    Furthermore, all Members discussed the propriety and legality of the unemployment insurance applications before filing them in spring 2020.

136.    The bottom line is that Ms. Greer worked no fewer than 1,647 hours for the LLC and the Venue, for which she has never been paid.

137.    Ms. Greer also is entitled to thousands of dollars for unreimbursed expenses and undisbursed credit card tips.

138.    Ms. Greer is entitled to fair compensation for her LLC equity interest, for a business venture that the Parties intended to last no fewer than ten years—the term of the lease that Ms. Greer negotiated and Mr. Nicewonder approved.

139.    Moreover, Mr. Nicewonder's lies about Ms. Greer have harmed her individually and endangered the LLC and Venue.

140.    Finally, Mr. Nicewonder's conduct entitles Ms. Greer to not only compensatory damages, but also punitive damages.

## CLAIMS

### COUNT I
### Breach of Contract

141.    Ms. Greer repeats the foregoing allegations as if set forth herein.

142.    The Operating Agreement entitles Ms. Greer to compensation for her equity interest, appropriate expenses, and services rendered.

143.    The Operating Agreement also establishes mandatory procedures for forcing a member out of the LLC.

144.    Yet Mr. Nicewonder breached all of these requirements.

145.    Mr. Nicewonder's breach of contract has damaged Ms. Greer in an amount to be revealed during discovery and proven during trial, currently estimated to be no less than $500,000 in expectation damages.

## COUNT II
## Breach of the Covenant of Good Faith and Fair Dealing

146.    Ms. Greer repeats the foregoing allegations as if set forth herein.

147.    By neither compensating Ms. Greer for her equity interest nor allowing her to participate in the LLC or Venue, Mr. Nicewonder has placed Ms. Greer in contractual and regulatory purgatory.

148.    While the Operating Agreement does not explicitly prohibit the other Members from using Ms. Greer's name and work to operate their business after freezing her out, Ms. Greer never could have anticipated that Mr. Nicewonder would continue to tell the relevant regulators that Ms. Greer was involved in running the LLC and Venue despite the freeze-out.

149.    The other Members continue to make these representations so that they can benefit from the various licenses necessary to operate the Venue, which are contingent on Ms. Greer's authorization and participation.

150.    Also implied in the Contract is that Mr. Nicewonder would not lie to force Ms. Greer out of the business, let alone defame her to third parties.

151.    These and Mr. Nicewonder's other breaches of the implied covenant have breached Ms. Greer in an amount to be revealed during discovery and proven at trial.

## COUNT III
## Unjust Enrichment

152. Ms. Greer repeats the foregoing allegations as if set forth herein.

153. Regardless of the Operating Agreement's enforceability, Ms. Greer spent thousands of hours on the LLC and the Venue.

154. By refusing to compensate Ms. Greer for her labor or equity, Mr. Nicewonder has unjustly enriched himself.

155. It is against equity and good conscience to allow Mr. Nicewonder to pay Ms. Greer nothing for her thousands of hours of work in building the LLC and Venue.

156. Mr. Nicewonder has unjustly enriched himself and owes Ms. Greer restitution in an amount to be revealed in discovery and proven at trial, currently estimated to total no less than $500,000.

## COUNT IV
## Defamation

157. Ms. Greer repeats the foregoing allegation as if set forth herein.

158. Mr. Nicewonder told third parties that the Members fired Ms. Greer because she broke the law.

159. At the time he did so, Mr. Nicewonder knew that this statement was false.

160. Mr. Nicewonder did not believe that she broke the law.

161. Indeed, the other Members, themselves, engaged in the very same allegedly-wrongful conduct, of which Mr. Nicewonder was aware.

162. Moreover, Ms. Greer's alleged unlawful acts were not the true reason that Mr. Nicewonder forced her out of the LLC and Venue.

163.    In fact, the only reason why the other Members froze out Ms. Greer was because they no longer liked working with her.

164.    Yet Mr. Nicewonder told third parties, including the Venue's employees, that they fired Ms. Greer because she engaged in illegal conduct.

165.    In doing so, Mr. Nicewonder has damaged Ms. Greer in an amount to be revealed during discovery and proven at trial.

**COUNT V**
**Business Disparagement**

166.    Ms. Greer repeats the foregoing allegation as if set forth herein.

167.    Mr. Nicewonder has told lies that impugn Ms. Greer's basic integrity by, for example, telling third parties that Ms. Greer broke the law in connection with her work on the LLC and the Venue.

168.    These lies are particularly damaging to Ms. Greer because she has invested tremendous amounts of time and expertise in building an excellent reputation in the music and hospitality industries, where significant business is done on the basis of reputation and trust.

169.    General damages exist because Mr. Nicewonder's lies impugned Ms. Greer's basic integrity.

## COUNT VI
## New York General Business Law § 349 – Deceptive Trade Practices

170.    Ms. Greer repeats the foregoing allegations as if set forth herein.

171.    Mr. Nicewonder has not only lied about Ms. Greer to third parties and the broader music and hospitality industries, but also continued to use Ms. Greer's name to do business, without which he and the other Members would lose the Venue's lease and liquor license.

172.    Particularly since these lies impact the regulation and oversight of bars, taverns, and liquor, Mr. Nicewonder's deceptive acts also harm the public at large.

173.    Mr. Nicewonder's deceptive business practices have harmed Ms. Greer in an amount to be revealed during discovery and proven at trial.

## COUNT VII
## Fraudulent Conveyance

174.    Ms. Greer repeats the foregoing allegations as if set forth herein.

175.    Mr. Nicewonder forced Ms. Greer out of the LLC and Venue in October 2020.

176.    At the time he did so, Mr. Nicewonder knew that he and the other Members owed Ms. Greer back wages and equity compensation.

177.    On November 12, 2020, Mr. Nicewonder caused Purgatory Events LLC ("**Events**") to incorporate in New York.

178.    On June 10, 2021, Events filed a Certificate of Merger with the Department of State, certifying that the LLC had merged with Events.

21

179.     Mr. Nicewonder incorporated Events in order to transfer all of the LLC's assets into an entity in which Ms. Greer had no equity interest.

180.     In fact, depriving Ms. Greer of her rightful ownership and compensation was the only reason why Mr. Nicewonder caused Events to become incorporated.

181.     That also was Mr. Nicewonder's sole reason for merging the LLC with Events.

182.     In doing so, Mr. Nicewonder caused Ms. Greer damages in an amount to be revealed during discovery and proven at trial.

## COUNT VIII
## Breach of Fiduciary Duty

183.     Ms. Greer repeats the foregoing allegations as if set forth herein.

184.     Mr. Nicewonder owes his fellow LLC Members, including Ms. Greer, fiduciary duties.

185.     However, Mr. Nicewonder has run the LLC into the ground.

186.     Mr. Nicewonder has continued to mismanage Purgatory since freezing out and firing Ms. Greer.

187.     Perhaps the best evidence of Mr. Nicewonder's fiduciary breaches is the Venue's revenue.

188.     While Ms. Greer's leadership ensured that the Venue broke even in its first two months of outdoor operation, the Venue has performed poorly since Mr. Nicewonder forced her out.

189.     For example, comparable neighborhood bars and music venues tend to have $20,000 to $40,000 of monthly revenue.

190.     But in April 2021, the Venue took in just $4,600 of credit card payments; in May 2021, approximately $9,000; in June, approximately $10,300; and in July, $4,700.

191.     As a comparison point, the Venue processed $8,500 of credit card payments in August 2020 and $11,400 in September 2020—the very first two months that it was open, and at outdoor-only capacity, to boot.

192.     While these numbers may not account for cash revenue, it is extremely unlikely that the Venue received enough cash to come close to what a properly-managed Bushwick bar and music venue has earned this summer.

193.     If the Venue did take in significantly more cash, it should have been deposited into the Bank Account so it could be properly documented, for both business and legal reasons.

194.     Whether these revenue shortfalls exist in reality or only on paper, Mr. Nicewonder has breached and continues to breach his fiduciary duty to Ms. Greer.

195.     In doing so, Mr. Nicewonder has caused Ms. Greer damages in an amount to be revealed during discovery and proven at trial.

## COUNT IX
### Accounting

196.    Ms. Greer repeats the foregoing allegations as if set forth herein.

197.    Mr. Nicewonder owes Ms. Greer fiduciary duties.

198.    By going into business with Mr. Nicewonder and laboring for the LLC, Ms. Greer entrusted him with her own valuable property.

199.    Mr. Nicewonder has repeatedly refused Ms. Greer's demands for an accounting.

200.    Because the LLC is a going concern, and because Mr. Nicewonder and the other Members have been grossly mismanaging the LLC and the Venue, Ms. Greer has no adequate remedy at law to protect her LLC interest.

201.    Therefore, Ms. Greer demands an accounting.

### Punitive Damages and Attorneys' Fees

202.    Ms. Greer repeats the previous allegations as if set forth herein.

203.    Mr. Nicewonder's conduct is egregious and should shock the conscience of all reasonable people.

204.    To deter others from engaging in similar conscience-shocking behavior and punish Mr. Nicewonder for his misconduct, the Court should hold them accountable for their false, intentional, and / or reckless conduct.

205.    Ms. Greer seeks no less than $250,000 in punitive damages, as well as reimbursement of all costs and attorneys' fees incurred herein.

**RELIEF REQUESTED**

Accordingly, Ms. Greer requests the following relief:

(i)     Damages or restitution in an amount to be determined at trial,
        totaling no less than $500,000;
(ii)    Punitive damages in an amount no less than $250,000;
(iii)   All costs and attorneys' fees, incidental and consequential relief,
        and all other relief that the Court finds just and proper.

**JURY DEMAND**

Ms. Greer demands a trial by jury.

Dated: August 17, 2021
         New York, New York

                                        **GUSRAE KAPLAN NUSBAUM PLLC**

                                        /s/ Ryan J. Whalen
                                        Ryan J. Whalen
                                        Kari Parks
                                        120 Wall Street
                                        New York, New York 10005
                                        (212) 269-1400
                                        rwhalen@gusraekaplan.com
                                        kparks@gusraekaplan.com

                                        *Attorneys for Plaintiff Patricia Greer*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

PATRICIA GREER

                Plaintiff,

     v.

JOHN "NICK" NICEWONDER,

                Defendant.

**VERIFICATION OF PATRICIA GREER**

Pursuant to 28 U.S.C. § 1746, I, Patricia Greer, declare as follows:

1.      I am the plaintiff in the above-captioned action.

2.      I have retained counsel in connection with this litigation.

3.      I have reviewed the Verified Complaint and I am familiar with its allegations.

4.      To the extent that the allegations in the Verified Complaint concern me and events for which I was present, I know those allegations to be true and correct.

5.      To the extent that the allegations in the Verified Complaint concern parties other than me, I believe those allegations to be true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 17, 2021.

/s/ Patricia Greer
Patricia Greer